NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: April 18, 2023

S23A0109.  PRIESTER v. THE STATE

COLVIN, Justice.

Appellant Joseph Priester was convicted of malice murder and related offenses in connection with the May 2017 shooting death of Genaro Rojas-Martinez.[1]  On appeal, Appellant contends that (1) the

---

[1] The crimes were committed on May 15, 2017.  On August 25, 2017 a Cobb County grand jury indicted Appellant for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), possession of a firearm during the commission of a felony (Count 4), and possession of a firearm by a convicted felon (Count 5).  A bifurcated jury trial commenced on September 14, 2018.  In the second portion of the bifurcated trial on the felony firearm possession charge, the State tendered a certified copy of Appellant's prior felony conviction for aggravated assault from Upson County.  The jury found Appellant guilty of all counts.  The trial court imposed a sentence of life in prison without the possibility of parole for malice murder (Count 1), plus a consecutive five-year term for the possession of a firearm during the commission of a felony (Count 4).  The trial court also imposed five years on probation for the possession of a firearm by a convicted felon count, to be served consecutively to Count 1 and concurrently with Count 4.  The other counts were either merged for sentencing purposes or vacated by operation of law.  On September 17, 2018, Appellant's trial counsel timely filed a motion for new trial, which was amended through new counsel on March 28, 2022.  The trial court held a hearing on the amended motion on June 6, 2022, and denied

trial court erred in admitting evidence of an armed robbery and shooting Appellant allegedly committed the day before the murder, pursuant to OCGA § 24-4-404 (b) ("Rule 404 (b)"); and (2) the trial court erred in instructing the jury that it could consider the prior armed-robbery and shooting evidence for the purposes of opportunity, intent, knowledge, and lack of mistake or accident. Seeing no reversible error, we affirm.

1. The evidence at trial showed the following.[2] On May 15, 2017, at 10:55 p.m., Smyrna Police Department officers were dispatched to a gas station located in Cobb County after multiple 911 calls reported a shooting. When officers arrived on the scene, they found Rojas-Martinez lying in "a large amount of blood" between his red 2006 Ford F150 truck and a gas pump. Medical

the amended motion on July 1, 2022. Appellant filed a timely notice of appeal. The case was docketed to our term of court beginning in December 2022 and submitted for a decision on the briefs.

[2] In light of the harmless-error analysis we undertake in Divisions 2 and 3 of this opinion, "we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Moore v. State*, 315 Ga. 263, 264 n.2 (1) (882 SE2d 227) (2022) (citation and punctuation omitted).

personnel pronounced him dead at the scene, and the medical examiner later determined that the cause of death was a gunshot wound to the back of the head. During their investigation, officers learned that Rojas-Martinez had stopped at the gas station on his way home from the restaurant where he worked as a waiter.

Officers obtained the restaurant's video surveillance footage from the night of the shooting. Entering the parking lot at 8:26 p.m. was a green 2002 Chevrolet Avalanche, with faded paint and various yard and cleaning equipment in the bed of the truck. The Avalanche remained in a parked position until 10:02 p.m. The Avalanche left the parking lot and returned at 10:27 p.m. The Avalanche exited the parking lot for the final time at 10:34 p.m. No one entered or exited the vehicle at any point during this timeframe.

Officers also viewed the gas station surveillance video, which showed that Rojas-Martinez entered the parking lot at approximately 10:53 p.m., parked in front of a gas pump, and then walked inside the gas station store. Thereafter, the green Avalanche entered the parking lot and parked on the opposite side of the pump

3

as Rojas-Martinez's truck. When Rojas-Martinez returned to his vehicle, a male wearing dark clothes and a hat exited the Avalanche. The man then ran up behind Rojas-Martinez, pointed a silver revolver at the back of his head, and fired. The revolver initially misfired, and the shooter quickly readjusted the gun and fired again. Rojas-Martinez immediately fell to the ground after the second shot. The shooter returned to the Avalanche and sped away from the gas station.

Investigators released images of the shooter and the Avalanche to local news outlets. The next day, Eddie Holland and Erikk Slaughter arrived at the Henry County Police Department with the Avalanche. In speaking with Holland and Slaughter,[3] officers learned that the Avalanche was titled in Slaughter's name and that Holland was in possession of the vehicle and in the process of buying it for his mobile pressure washing business. Holland stated that, on the night of the shooting, he lent the Avalanche to Appellant, who had worked a job for Holland earlier that day. Appellant planned to

---

[3] Both Holland and Slaughter testified for the State at trial.

spend the night at Holland's house in McDonough to work another job the following day, and had asked to borrow the truck to drive to his mother's house to pick up some clothes. At the time Holland went to bed on May 15, Appellant had not returned with the truck. However, when Holland woke up the next day, Appellant was asleep on Holland's couch and the Avalanche was parked outside Holland's home.  Later that morning, Appellant informed Holland that he was no longer interested in working the job Holland had previously offered to him.  Both Holland and Slaughter identified the green Avalanche in the surveillance videos as the vehicle that Holland was in the process of buying from Slaughter.

Officers applied for and received a search warrant for the Avalanche and Appellant's cell phone records.  Officers did not lift any fingerprints from the Avalanche.  However, the cell phone records revealed that Appellant's phone pinged off a cell tower located in McDonough in the approximate vicinity of Holland's house around 7:40 p.m. on the night of the shooting.  Between 8:42 p.m. and 10:16 p.m., Appellant's cell phone pinged off a tower located

in Smyrna approximately 40 miles away from Holland's house and 4 miles from the restaurant at which Rojas-Martinez was working. Then, at 10:56 p.m., approximately one minute after the Smyrna Police Department received its first 911 call to report the shooting, Appellant's cell phone made an outgoing call to a cell phone number associated with a man named Byron Scott. This call pinged off a cell tower located less than 1.2 miles from the gas station. The cell site location data indicated that, after Appellant made the 10:56 p.m. call to Scott, he traveled toward the east side of Atlanta. Within the next hour, Appellant called Scott four additional times, and Appellant's last known location on that evening was in the general area of Scott's address.

Officers obtained a warrant for Appellant's arrest on May 18, 2017. Appellant was located and arrested by the U.S. Marshals Service in New Jersey on June 3.

At trial, defense counsel argued that Appellant was not the person who shot Rojas-Martinez. To support this theory, defense counsel presented evidence that officers initially apprehended a

different person immediately after the shooting, and further questioned officers about what Appellant characterized as an incomplete investigation into Scott's potential involvement in the shooting. However, the investigating officer testified that the wrong person was apprehended because a 911 caller had misreported the shooter's vehicle and that he had interviewed Scott shortly after obtaining Appellant's cell-phone records and had completed a report detailing this investigation.

2. In addition to the evidence described in Division 1, the State introduced evidence pursuant to Rule 404 (b)[4] that Appellant had committed an armed robbery and shot at a car during a drug deal on the day before Rojas-Martinez's murder. At trial, the State called Zack Kelly, who testified that, on the day prior to Rojas-Martinez's death, he and his friend, Danny Farmer, went with Appellant to an apartment complex "to purchase some drugs." Upon their arrival,

---

[4] Under Rule 404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but may be admissible "for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OCGA § 24-4-404 (b).

Appellant pulled out a large, silver .44 magnum revolver that was about 15 inches in length, "stuck the gun to [Kelly's] head," and demanded Kelly's money. Appellant also pointed the gun at Farmer and demanded his money as well. When Farmer threw his money onto the ground, Appellant "picked the money up and walked around to the front of the car, fired a round into the car, and . . . just walked away."

Appellant objected to the admission of this evidence on multiple grounds, including that the evidence was not relevant to any issue other than Appellant's bad character and that any probative value was substantially outweighed by its prejudicial effect. The trial court overruled the objection, finding that the evidence was admissible under Rule 404 (b) to show opportunity, intent, knowledge, and absence of mistake or accident. In doing so, the trial court determined that the evidence showed that Appellant had a gun similar to the one shown in the gas station footage, knew about handguns, had previously fired a handgun, and was in Georgia when the crime was committed. The trial court then

8

instructed the jury before Kelly's testimony and again during the final charge on the permissible purposes for which it could consider the evidence, informed the jury that it could not use the evidence to conclude that Appellant had a propensity to commit crimes, and reminded the jury that Appellant was on trial for the offenses charged in the indictment and not for any other acts.

Appellant asserts that this ruling was error. The State concedes that the trial court erred by admitting the Rule 404 (b) evidence for the purposes of intent, knowledge, and lack of mistake or accident. However, the State maintains that the evidence was admissible for the purpose of proving opportunity under Rule 404 (b). Assuming without deciding that the trial court erred in admitting this evidence, the error was harmless and, therefore, does not require reversal.

"The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Henry v. State*, 307 Ga. 140, 146 (2) (c) (834 SE2d 861) (2019) (citation and punctuation omitted). When determining

9

whether the error was harmless, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." *Saxton v. State*, 313 Ga. 48, 51 (2) (b) (867 SE2d 130) (2021) (citation and punctuation omitted). We have previously concluded that erroneously admitted Rule 404 (b) evidence was not harmful where the properly admitted "evidence against [the defendant] was strong," see *Allen v. State*, 310 Ga. 411, 415 (2) (851 SE2d 541) (2020), and where "the trial court instructed the jury that it could consider the other acts evidence only for the limited [Rule 404 (b)] purpose[s]," see *Edwards v. State*, 308 Ga. 176, 184 (3) (839 SE2d 599) (2020).

Here, the evidence against Appellant was strong. Although Appellant argued at trial that someone else shot the victim, the jury was shown the gas station surveillance video, which captured the shooter's face, profile, and distinctive car; heard unrebutted testimony that, on the night of the shooting, Appellant was in possession of the green Avalanche shown in the surveillance videos; and heard testimony that the cell site location data from Appellant's

phone placed him near the restaurant during Rojas-Martinez's shift shortly before the shooting, and approximately one mile away from the gas station immediately after the shooting. Moreover, the jury heard testimony that, on the morning after Rojas-Martinez's murder, Appellant informed Holland that he was no longer interested in working for him, and that, at some point afterward, he fled the state. Additionally, the defense's theory that someone else had shot the victim was undermined by the investigating officer's testimony that he had completed an investigation into Scott's potential involvement with the shooting and that officers had originally apprehended the wrong person because a 911 caller misreported the shooter's vehicle.

Further, the trial court twice instructed the jury that it could only consider the other-act evidence for the limited Rule 404 (b) purposes and that it could not conclude from the evidence that Appellant had a propensity to commit crimes, and the court reminded the jury that Appellant was on trial only for the charges listed in the indictment. Because we presume that jurors follow the

11

trial court's instructions, any harm caused by the Rule 404 (b) evidence was mitigated by the trial court's instructions limiting the jury's consideration of the evidence.  See *Williams v. State*, 313 Ga. 443, 449-450 (1) (870 SE2d 397) (2022) ("Because we ordinarily presume that jurors follow [the trial court's instructions], any unfair prejudice from the admission of the [Rule 404 (b)] evidence was reduced." (citation and punctuation omitted)).  Moreover, although the trial court instructed the jury that it could consider the other-act evidence for the purposes of intent, knowledge, and absence of mistake or accident, which the State concedes were not permissible purposes, the instructions, as a whole, reduced the likelihood that any error in admitting the armed-robbery and shooting evidence contributed to the verdict, as "they did, at least, tell the jury what it could *not* do," namely, that the jury could not consider the evidence as proof of Appellant's propensity to commit crimes.  *Nundra v. State*, __Ga. __, __ (2) (__ SE2d __) (2023) (emphasis in original) (although the limiting instructions "did not meaningfully explain for which permissible purpose the [Rule 404 (b)] evidence was relevant,"

12

the trial court's "admonition that the jury may not infer from such evidence that the accused is of a character that would commit such crimes reduce[d] the likelihood that the evidence of [the defendant's] past crimes influenced the verdict" (punctuation omitted)).

Therefore, given the strength of the evidence against Appellant and the trial court's limiting instructions, we conclude that it is highly probable that the admission of the armed-robbery and shooting evidence did not contribute to the verdict. See *Howell v. State*, 307 Ga. 865, 875-876 (3) (838 SE2d 839) (2020) (admission of Rule 404 (b) evidence harmless where evidence of Appellant's guilt was strong and the trial court instructed the jury that it could consider the other-act evidence only for the limited Rule 404 (b) purpose, that Appellant was on trial only for the offenses charged in the current case, and that the other-act evidence, by itself, could not be a basis for conviction). Accordingly, Appellant's claim fails.

3. Appellant next contends that the trial court erred by instructing the jury that it could consider the armed-robbery and shooting as Rule 404 (b) evidence for the limited purposes of

opportunity, intent, knowledge, and absence of mistake or accident, because the evidence itself was improper. We again identify no reversible error.

Because trial counsel did not object to the jury instructions, we review the trial court's jury instructions under the plain-error standard. See *State v. Williams*, 308 Ga. 228, 231 (1) (838 SE2d 764) (2020). To satisfy plain error review, Appellant must show that "the alleged instructional error was not affirmatively waived; was clear and obvious, rather than subject to reasonable dispute; likely affected the outcome of the trial; and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Walker v. State*, 311 Ga. 719, 724 (3) (859 SE2d 25) (2021) (citation and punctuation omitted).

Appellant's claim fails because he cannot satisfy plain error review. As explained in Division 2, the State has conceded that the admission of the armed-robbery and shooting evidence for the purposes of intent, knowledge, and absence of mistake or accident was erroneous. However, even assuming that the trial court clearly

14

erred by instructing the jury that the Rule 404 (b) evidence could be considered for those purposes and for the purpose of opportunity, Appellant has failed to satisfy the third prong of plain error review: that the challenged instructions likely affected the outcome of his trial.

When determining whether a jury instruction likely affected the outcome of the trial, this Court considers the jury instruction as a whole, rather than looking at the challenged instruction in isolation. See *Carpenter v. State*, 305 Ga. 725, 728 (3) (827 SE2d 250) (2019). Here, the trial court instructed the jury that it could not use the other-act evidence to make an inference about Appellant's character or as evidence that Appellant had a propensity to commit crimes. Moreover, the trial court reiterated to the jury that Appellant was "on trial for the offenses charged in this bill of indictment only and not for any other acts, even though such acts may incidentally be criminal"; that the State carried the burden "to prove every material allegation of the indictment and every essential element of the crimes charged beyond a reasonable doubt,"

15

which included the elements of intent and identity; and that the jury could not convict Appellant "of any crime unless and until each element of the crime as charged is proven beyond a reasonable doubt." As discussed above, we assume that the jury followed the trial court's instructions not to use the other-act evidence to make improper inferences about Appellant's character or propensity to commit crimes. Further, although the trial court instructed the jury that it could consider the other-act evidence for the purposes of intent, knowledge, and absence of mistake or accident, such instructions did not likely affect the outcome of Appellant's trial, even if the jury considered the evidence for such impermissible purposes, given the strength of the evidence of Appellant's guilt. As discussed above, the jury was shown the gas station surveillance video of the shooting and heard unrebutted testimony that Appellant was in possession of the green Avalanche seen in the video and that the cell site location data from Appellant's phone placed him approximately one mile from the gas station immediately after the shooting. Therefore, based on the trial court's instructions as a

16

whole and the strong evidence of Appellant's guilt, we cannot say that the challenged instructional error likely affected the outcome of his trial.[5] See *Jones v. State*, 302 Ga. 892, 897-898 (3) (810 SE2d 140) (2018) (concluding any error in the jury instructions was harmless, given the court's instruction as a whole and the very strong evidence of defendant's guilt).

*Judgment affirmed. All the Justices concur, except Peterson, P.J., disqualified.*

---

[5] Appellant has not raised a cumulative-error claim, and we discern no cumulative prejudice from the evidentiary and instructional errors we assume. See *State v. Lane*, 308 Ga. 10, 18 (1) (838 SE2d 808 (2020) ("[A] defendant who wishes to take advantage of the [cumulative-error] rule that we adopt today should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.").