NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 18, 2025

S24A1187. WATKINS v. THE STATE.

ELLINGTON, Justice.

Roderick Watkins was convicted of malice murder and other crimes related to the March 14, 2012, shooting death of Ashley Clark and her unborn child.[1] On appeal, Watkins alleges four evidentiary

---

[1] On June 8, 2012, a Fulton County grand jury indicted Watkins for murder; felony murder predicated on aggravated assault; feticide; aggravated assault with a deadly weapon; three counts of possession of a firearm during commission of a felony predicated on aggravated assault, feticide, and possession of cocaine, respectively; and possession of cocaine. On September 14, 2014, a jury found Watkins guilty on all counts. The trial court sentenced Watkins to life in prison for murder; life in prison for feticide, to run consecutively to its sentence for murder; five years in prison for possession of a firearm during the commission of a felony predicated on aggravated assault, to run consecutively to its sentence for feticide; five years in prison for possession of a firearm during the commission of a felony predicated on feticide, to run consecutively to its sentence for possession of a firearm during the commission of a felony predicated on aggravated assault; five years of probation for possession of a firearm during the commission of a felony predicated on possession of cocaine, to run consecutively to its sentence for possession of cocaine; and fifteen years in prison for possession of cocaine, to run consecutively to its sentence for possession of a firearm during the commission of a felony predicated on feticide. Although the trial court

errors and three claims of constitutionally ineffective assistance of counsel. For the reasons explained below, we affirm in part and reverse in part.

1. The evidence presented at trial showed the following. Watkins and Clark were in a romantic relationship between 2009 and Clark's death in 2012. In the summer of 2011, Clark became pregnant and had an abortion. Clark recorded some sentiments related to having an abortion in a diary entry dated August 2, 2011. In particular, she wrote that she could not "stop thinking about [her] little fetus" and that "if [she] was to get pregnant again, getting an abortion [was] out of the question."  Clark also wrote that Watkins was not there to comfort her as he was "locked up" and "in jail"

---

purported to merge the felony murder count with the murder count for sentencing,  the felony murder count actually was vacated by operation of law. See *Williams v. State*, 316 Ga. 147, 153 (3) (886 SE2d 818) (2023). The trial court merged the aggravated assault with a deadly weapon count with the murder count. Watkins timely moved for a new trial on September 17, 2014. Watkins amended his motion for a new trial on March 28, 2019; February 20, 2020; and March 15, 2023. After hearings on February 25, 2020, and May 10, 2023, the trial court denied Watkins's motion for new trial, as amended, on January 17, 2024. Watkins filed a timely notice of appeal on January 18, 2024, and amended it on January 22, 2024. This case was docketed in this Court to the August 2024 term and submitted for a decision on the briefs.

because of the "way he . . . ma[d]e money[.]"

In the latter half of 2011 and beginning of 2012, Clark's relationship with Watkins deteriorated. During this time, Clark wrote in her diary about "the physical, verbal, and emotional abuse" she suffered from Watkins.[2]  On one occasion, Clark wrote that she "made a mistake by taking to[o] much money for [her] Breeze card" and that Watkins was going to "beat [her] a**."  On another, Clark wrote that Watkins "beat" her for the "third time[.]"  Clark also told her friend, Jasmin Adams, that Watkins "resent[ed]" Clark's friendships and so she "cut all of her friends off."  Clark recorded in her diary the social isolation she experienced in her relationship with Watkins: "I can't talk to [Watkins] [be]cause as always, nothing will ever get accomplished. I can't talk to my family [be]cause they want me to leave [Watkins] alone. I can't talk to my friends [be]cause I really don't have any. So who am I left with? Me and my journal. That's all I got."

---

[2] It appears from Clark's diary entries that Watkins was no longer incarcerated by September 2011, although the record is unclear as to the exact date of his release.

In late 2011, Clark discovered that she was pregnant again. Watkins wanted her to have another abortion. Clark disagreed, journaling that she still "regret[ted]" having the prior abortion and that she did not think she could "go thr[ough] with another abortion" because the first one still "messe[d] with [her] mentally and physically." Moreover, Clark told her aunt that she was "happy" about the pregnancy and "wanted to keep it," although at a time when she was frustrated with Watkins, she wrote in her diary that she did not "want this baby." Clark also told her aunt that "she wasn't going to get rid of this baby, whether [Watkins] want[ed] a part of [the child] or not."

On March 13, 2012, Clark wrote in her diary that Watkins "plan[ned] on making [her] have a miscarriage" and that she "pray[ed] to God that he protect[ed] [her] and [the] baby." The next night, while in Clark's apartment, Watkins fatally shot Clark in the torso. Clark's unborn child also died as a result of the shooting.

In the aftermath of the shooting, Detective Penny Cavin found Clark's diary in her bedroom closet. She also seized several bags of

4

"crack cocaine," a straight razor, and a digital scale from the apartment.

At trial, the State argued that Watkins murdered Clark because she refused to have another abortion, contending that the shooting was part of an escalating pattern of Watkins's physical and emotional abuse. To explain patterns of domestic abuse, a domestic violence expert testified that physical violence in an abusive romantic relationship is "sporadic" in the beginning. However, "other behaviors" continue, such as "isolati[ng]" the victim "from their friends, family, [and] controlling whether they [are] allowed to speak to them or see them[.]"  The domestic violence expert further testified that "over time . . . the violence escalates" and "the abuse will . . . get worse when the relationship moves forward, such as . . . when the victim becomes pregnant."

Watkins testified in his own defense at trial and contended that the shooting was an accident. He explained that he gave Clark a .357 Magnum to store in the living room sofa—with the hammer cocked—after Clark's apartment building was burgled. Watkins also

testified that on the night of the shooting, Clark was watching television in Clark's apartment. Watkins asked Clark to hand him the gun. With her eyes still trained on the television screen, Clark picked up the gun, with the hammer cocked and muzzle pointed at Watkins. Alarmed, Watkins said, "pay attention[.]" In response, Clark "palm roll[ed]" the gun. As Watkins reached for the top of the muzzle with his left hand, the gun fired. Watkins testified that the muzzle blast burned his left hand when he tried to grasp the muzzle.

However, the State contended that Watkins fabricated this defense. To that end, Adams—whom Watkins summoned to Clark's apartment on the night of the shooting—testified that Watkins "never told [her] what happened" that night. Watkins's stepmother, Tammy Caldwell, also testified that Watkins never told her "what happened," although she said that Watkins repeatedly told her that he "didn't shoot nobody." Detective Cavin—who questioned Watkins at the scene before arresting him—testified that no one told her that night that the shooting was an accident.

Additionally, a Georgia Bureau of Investigation analyst

6

testified at trial about the gun that shot Clark. He said that the gun required three pounds of pressure to fire with the hammer cocked. However, even with the hammer cocked, he testified that a shooter needed to have a finger inside the trigger loop while "pull[ing] and hold[ing]" the trigger to fire the gun. Otherwise, he testified, the internal safety feature would reset after the trigger was pulled and prevent the gun from firing.

2. Watkins contends that the trial court abused its discretion in admitting into evidence unredacted excerpts from Clark's diary in violation of OCGA §§ 24-8-807 ("Rule 807"), 24-4-404 ("Rule 404"), and 24-4-403 ("Rule 403"). For the reasons explained below, this claim fails.

At a pre-trial hearing on Watkins's motion to exclude statements in Clark's diary, the State sought to admit three unredacted excerpts from Clark's diary containing Clark's reflections about her relationship with Watkins, contending that

they were admissible under Rule 803 (3).[3]     Watkins, however, argued that these statements were not admissible under any exceptions to the hearsay rule set out in Rule 803 or under the "residual exception" set out in Rule 807. Watkins further asserted that the danger of unfair prejudice substantially outweighed the probative value of the excerpts. See OCGA § 24-4-403. The trial court did not first determine whether the statements were admissible under Rule 803 (3) before concluding that the statements were admissible under Rule 807 based on "where" the diary was found—Clark's bedroom closet—and "what's in it" if the State laid proper foundation at trial that the handwriting in the diary was Clark's.   At trial, Clark's mother testified that the handwriting in

---

[3] That subsection provides that the hearsay rule does not exclude from evidence:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless such statements relate to the execution, revocation, identification, or terms of the declarant's will and not including a statement of belief as to the intent of another person.

OCGA § 24-8-803 (3).

the diary was Clark's. The trial court admitted the whole diary into evidence.[4]

On appeal, Watkins contends that the trial court abused its discretion in admitting the three unredacted diary excerpts in violation of Rules 807, 404, and 403. We examine each argument in turn.

A. *Rule 807.*

Assuming without deciding that the statements at issue were not admissible under Rule 803 (3), we conclude that the trial court did not abuse its discretion in concluding that the statements were admissible under Rule 807.[5] Rule 807 provides that a statement "not

---

[4] On appeal, Watkins challenges the admission of "unredacted diary excerpts," but he does not expressly challenge the admission of the diary as a whole.

[5] As noted above, the record shows that the trial court admitted the entries under Rule 807 instead of first determining whether the entries were admissible under Rule 803 (3), as the State contended. As we have previously cautioned, "because the residual exception applies only to statements not specifically covered by any law, trial courts should consider whether a specific exception to the hearsay rule applies before applying Rule 807." *State v. Hamilton*, 308 Ga. 116, 124 n.10 (839 SE2d 560) (2020) (noting that "Rule 807's residual hearsay exception is designed to be used very rarely, and only in exceptional circumstances.") (cleaned up). See also *State v. Kenney*, 315 Ga. 408, 421-423 (883 SE2d 298) (2023) (Warren, J., concurring specially).

specifically covered by any law" but possessing "equivalent circumstantial guarantees of trustworthiness" is admissible if the trial court determines that

> (1) [t]he statement is offered as evidence of a material fact;

> (2) [t]he statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

> (3) [t]he general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

OCGA § 24-8-807. See also *Shellman v. State,* 318 Ga. 71, 77 (3) (b) (897 SE2d 355) (2024). "In assessing whether evidence is admissible under Rule 807, a trial court 'should consider the totality of the circumstances.'" *Shellman,* 318 Ga. at 77 (3) (b) (citation omitted).

i. *Guarantees of Trustworthiness.*

Whether statements are sufficiently trustworthy depends on "the circumstances under which the statements were originally made[.]" *Shellman,* 318 Ga. at 77 (3) (b). Here, the trial court was within its discretion to conclude that the diary bore "equivalent

10

circumstantial guarantees of trustworthiness." The diary as a whole shows that Clark wrote in her "own words" to reflect on her volatile relationship with Watkins. *Jones v. State*, 311 Ga. 455, 460 (2) (b) (858 SE2d 462) (2021) (explaining that the domestic-violence victim's writings in her "own words concerning her unhappy relationship with Appellant and his angry and controlling behavior" provided support for the trial court's finding of trustworthiness). However, Watkins points to statements in the diary reflecting that Clark was conflicted about having the baby and that she sometimes lied to her family about her relationship with Watkins as suggesting that Clark had a motive to fabricate the sentiments recorded in the diary. See id. Although Clark expressed in her diary contradictory sentiments about having children with Watkins, she wrote that she was opposed to having another abortion—a sentiment that was confirmed by Clark's aunt, who testified that "no matter what[,] [Clark] said she wasn't going to get rid of [the second] baby, whether [Watkins] want[ed] a part of [that] baby or not[.]" Moreover, Clark's own written statements demonstrate that she relied on her diary as

11

an outlet to record her candid sentiments about her relationship with Watkins. For example, Clark wrote that "I can't talk to my family . . . . I can't talk to my friends . . . . So who am I left with? Me and my journal. That's all I got." The isolation Clark expressed, driving her to write in her diary, was consistent with the testimony of Clark's friend, Adams, who testified that Watkins "resent[ed]" Clark's friendships, and Clark "cut all of her friends off," because of "what [Watkins] want[ed.]"     In addition, the trial court was authorized to conclude that the fact that the diary was found in Clark's bedroom closet—a likely place to hide such an item—indicates that Clark was writing only for herself, minimizing the likelihood that Clark fabricated the statements in the diary. Under these circumstances, we cannot say that the trial court abused its discretion in determining that the diary bore "equivalent circumstantial guarantees of trustworthiness." See *Shellman*, 318 Ga. at 77 (3) (b) (concluding that the trial court did not abuse its discretion in determining that the diary found in the closet of a deceased victim of domestic violence bore "equivalent circumstantial

guarantees of trustworthiness" where "the entries detailed in [the victim's] own words her volatile relationship with [the appellant], and there was no evidence suggesting that [the victim] had a motive to fabricate her statements when she wrote them"); *Jones*, 311 Ga. at 460 (2) (b) (same).

ii. *Materiality*.

Rule 807 (1) requires that the statement be "offered as evidence of a material fact[.]" OCGA § 24-8-807 (1). Here, the diary excerpts were material because they provided observations in Clark's own words about the nature of her relationship with Watkins in the months leading up to the shooting, including that Watkins "beat" her and wanted to cause her to have a miscarriage. See *Jones*, 311 Ga. at 459, 461 (2) (b) (stating that a deceased domestic violence victim's diary entries, where the victim stated she was "scared" and felt like she was "walk[ing] on eggshells" around the defendant, satisfied the materiality requirement of Rule 807 because they shed "light on [the defendant's] motive").

iii. *Probativeness.*

Rule 807 (2) requires that the statement be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts[.]" OCGA § 24-8-807 (2). The trial court did not abuse its discretion in concluding that Clark's diary entries satisfied this requirement. The State offered the diary entries to show that Watkins wanted to cause Clark to have a miscarriage because she refused to have another abortion. Although Watkins contends that trial testimony from Clark's aunt— stating that Watkins wanted Clark to have another abortion—was equally probative, the trial court was authorized to conclude that Clark' statements on the subject were more probative than any third-party testimony. See *Shellman*, 318 Ga. at 78 (3) (b) ("Although other witnesses also testified in general terms about the nature of [the appellant's] and [victim's] relationship, it was within the trial court's discretion to conclude that [the victim's] own contemporaneous account was more probative than any third party's testimony."); *Jones*, 311 Ga. at 461 (2) (b) ("Appellant has not shown

14

under paragraph (2) of Rule 807 that there was other evidence that the State could have procured with reasonable efforts that would have been more probative to show Appellant's motive than the diary entries, which provided [the victim's] firsthand account of her relationship with and fear of Appellant before she was beaten to death in their motel room.").

iv. *Interests of Justice.*

Finally, Watkins offers no argument that, and we see no reason why, the interests of justice were not best served by the trial court's admission of the diary excerpts. See OCGA § 24-8-807 (3); *Shellman*, 318 Ga. at 78 (concluding that the trial court did not abuse its discretion in admitting a deceased domestic-violence victim's journal entries under Rule 807 where the appellant offered "no argument that the interests of justice were not best served by the admission of the journal entries"). Consequently, we cannot say that the trial court abused its discretion in admitting the diary excerpts under Rule 807.

15

B. *Rule 404.*

Watkins also contends that the trial court abused its discretion under Rule 404 (a)[6] in admitting Clark's unredacted diary excerpt from August 2, 2011, on the ground that it "contained statements or inferences that multiple associates of . . . Clark felt poorly toward . . . Watkins, that . . . Watkins was previously 'locked up' and 'in jail,' and that he made money in some undesirable way."

As an initial matter, we review this claim for plain error because Watkins did not object at trial under Rule 404 (a) and first raised this alleged abuse of discretion in his third amended motion for new trial. See OCGA § 24-1-103 (d); *White v. State*, 305 Ga. 111, 113 n.2 (823 SE2d 794) (2019) (limiting appellate review of alleged evidentiary error to plain error where appellant failed to object at trial on the basis later raised his amended motion for new trial).

> To establish plain error, Appellant must show (1) an error that was not affirmatively waived, (2) that the error was clear and obvious, and (3) that the error affected his substantial rights, which in the ordinary case means he

---

[6] OCGA § 24-4-404 generally provides that "[e]vidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion[.]"

16

must demonstrate that it affected the outcome of the trial court proceedings. If Appellant made such a showing, we would have discretion to remedy the error, but "only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Davis v. State*, 305 Ga. 640, 643 (2) (827 SE2d 265) (2019) (citation and punctuation omitted). "If one prong of the plain error test is not satisfied, we need not address the other prongs of the test." *Baker v. State*, 319 Ga. 456, 462 (2) (902 SE2d 645) (2024). "Satisfying this high standard is difficult, as it should be." Id. (cleaned up).

Watkins's plain-error claim fails on the third prong—he has not demonstrated that the alleged error affected the outcome of the trial court proceedings as to the non-drug counts, and therefore has not shown that the error affected his substantial rights, because there was compelling evidence from which the jury could infer that Watkins murdered Clark.[7] To begin, it is undisputed that Watkins was the only person present in the apartment besides Clark when

---

[7] We limit this analysis to whether the admission of the diary excerpts affected Watkins's substantial rights as to the verdicts on the counts related to murder because, as explained in Division 3, we reverse his convictions for two drug-related convictions.

Clark was shot and that he was touching the gun when Clark was shot. Moreover, the GBI firearms analyst's testimony that shooting the .357 Magnum required a shooter to place a finger inside the trigger loop while "pull[ing] and hold[ing]" the trigger undermined Watkins's contention that the gun accidentally fired when Clark "palm roll[ed]" it to him, which, in turn, damaged Watkins's credibility.

Additionally, Clark's fear that Watkins "plan[ned] on making [her] have a miscarriage"—recorded in her diary the day before she died—provided strong evidence from which the jury could infer that Watkins murdered Clark and committed feticide because she refused to have an abortion.[8] That evidence was corroborated by the domestic violence expert, who testified that "the abuse will . . . get worse when the relationship moves forward, such as . . . when the victim becomes pregnant."

Further, Clark's references to Watkins's incarceration do not indicate that Watkins was incarcerated as punishment for violent

---

[8] Watkins does not specifically challenge this statement on appeal.

behavior, making it unlikely that the jury improperly inferred from them that Watkins had a propensity to murder. For all of these reasons, it is unlikely that these references affected the verdicts. See, e.g., *Redding v. State*, 320 Ga. 107, 117-118 (3) (b) (907 SE2d 258) (2024) (holding that any error in admitting other-acts evidence of the appellant's violent behavior during traffic stop was harmless in trial for felony murder where "the evidence against [the appellant] was strong," the appellant's self-defense claim was weak, and "it [was] difficult to see how the other-acts evidence . . . would have had a 'significant influence' on the jury"). Watkins's plain-error claim therefore fails.

C. *Rule 403.*

Watkins also contends that the trial court abused its discretion in admitting the diary statements that Watkins was "locked up" and "in jail" in violation of Rule 403 because they "allow[ed] inferences that . . . Watkins was a criminal and a drug dealer." Pretermitting whether the trial court abused its discretion in admitting this evidence, any abuse of discretion in admitting it was harmless as to

the non-drug counts and therefore does not require reversal.[9]

"The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Priester v. State*, 316 Ga. 133, 137 (886 SE2d 805) (2023) (citation and punctuation omitted). "In conducting harmless-error analysis, 'we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done.'" *Saxton v. State*, 313 Ga. 48, 51 (867 SE2d 130) (2021).

Here, we conclude that it is highly probable that any abuse of discretion in admitting the evidence at issue did not contribute to the verdicts on the non-drug counts because the evidence of Watkins's guilt was strong. To begin, it was undisputed at trial that Watkins was the only person besides Clark present in the apartment when Clark was shot and that he was touching the gun when Clark was shot. And, as explained above, the State provided evidence from

---

[9] We limit this analysis to evaluation of the prejudice as to the non-drug counts because, as explained in Division 3, we reverse Watkins's convictions for possession of cocaine and possession of a firearm during commission of a felony predicated on possession of cocaine.

the GBI firearms analyst that undermined Watkins's accident defense and strengthened the State's argument that Watkins intentionally fired the gun at Clark. Additionally, the State's argument that Watkins intentionally shot Clark was supported by compelling evidence from Clark's diary entries and the domestic abuse expert, as discussed above. Further, Clark's references to Watkins's incarceration do not indicate that Watkins was incarcerated as punishment for violent behavior, making it unlikely that the jury improperly inferred from them that Watkins had a propensity to murder. For all of these reasons, it is highly probable that any abuse of discretion in admitting this evidence in violation of Rule 403 did not contribute to the verdicts on the non-drug counts. See, e.g., *Hood v. State*, 299 Ga. 95, 106 (786 SE2d 648) (2016) (concluding that it was highly probable that the trial court's admission of evidence in violation of Rule 403 did not contribute to the verdicts, and therefore was not reversible error, because the evidence that the appellant "committed the crimes for which he was convicted was strong").

21

3. Watkins contends that we should reverse his convictions based on the United States Supreme Court's recent decision in *Smith v. Arizona,* 602 U.S. 779, 798-799 (II) (144 SCt 1785, 219 LE2d 420) (2024), arguing that a Georgia Bureau of Investigation laboratory analyst's testimony violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. For the reasons explained below, we conclude that the GBI laboratory analyst's testimony violated the Confrontation Clause and therefore that Watkins's convictions for possession of cocaine and possession of a firearm during the commission of a felony predicated on possession of cocaine cannot stand. We accordingly reverse those convictions.

On the night of the shooting, Detective Cavin seized a substance that appeared to be cocaine from Clark's apartment. Amber Sloan, an analyst with the GBI, prepared a forensic report certifying that the substance was cocaine. Accordingly, Watkins was charged with possession of cocaine and possession of a firearm during the commission of a felony predicated on possession of

22

cocaine.

Sloan's employment with the GBI ended before Watkins's trial, so the State called Joseph Karpf, another GBI analyst, to testify about the factual assertions in Sloan's report and to state his own conclusion about Sloan's testing. Karpf testified that he issued his own report stating that he "agree[d] with [Sloan's] findings" and reviewed data confirming that the substance Sloan tested did "in fact contain cocaine." But Karpf also testified that he "perform[ed] no analysis" and "never actually had possession of" the cocaine Sloan tested. Watkins did not object to Karpf's testimony nor to the admission of Sloan's report.

As an initial matter, Watkins concedes that he did not preserve this claim for ordinary appellate review because he did not object to Karpf's testimony at trial. See *Kenney*, 315 Ga. at 413 (2) n.10 (noting that "we ordinarily review forfeited evidentiary arguments for plain error" under OCGA § 24-1-103 (d)). Under plain-error review, Watkins

must point to an error that was not affirmatively waived,

23

the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

*State v. Herrera-Bustamante*, 304 Ga. 259, 264 (2) (b) (818 SE2d 552) (2018) (citation and punctuation omitted). "The 'current law' considered is the law at the time of appellate review rather than at trial[.]" Id. Because *Smith v. Arizona* was decided before the time of this appellate review, it is current law for purposes of this analysis. See id. Therefore, we consider below whether the trial court plainly erred under *Smith v. Arizona* in admitting Karpf's testimony.

First, although Watkins did not object to Karpf's testimony at trial, the record does not show that Watkins affirmatively waived this claim of plain error by intentionally relinquishing or abandoning a known right. See, e.g., *Gonzalez v. State*, 319 Ga. 787, 791 (3) (a) (906 SE2d 705) (2024) (explaining under the first prong of the plain-error test that "there must be an error or defect – some sort of deviation from a legal rule – that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the

24

appellant").

Second, the trial court clearly and obviously erred. See *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (providing that an appellant attempting to meet his burden under the plain-error standard must show that "the legal error [is] clear or obvious, rather than subject to reasonable dispute[ ]") (citation omitted). To begin, the Sixth Amendment's Confrontation Clause prohibits the admission of "testimonial statements" of a non-testifying witness unless he is "unavailable to testify, and the defendant ha[s] had a prior opportunity" to cross-examine him. *Crawford v. Washington*, 541 U.S. 36, 53-54 (III) (124 SCt 1354, 158 LE2d 177) (2004). Moreover, "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing." *Smith*, 602 U.S. at 783 (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (129 SCt 2527, 174 LE2d 314) (2009)). Building on the foregoing principle, the United States Supreme Court held in *Bullcoming v. New Mexico*, 564 U.S. 647 (131 SCt 2705, 180 LE2d 610) (2011) that

the Confrontation Clause does not permit the prosecution to offer into evidence a "forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification."

*Williams v. State*, 316 Ga. 304, 317 (5) (b) (888 SE2d 60) (2023) (quoting *Bullcoming*, 564 U. S. at 652)). Approximately twelve years after the United States Supreme Court's decision in *Bullcoming*, that Court held in *Smith v. Arizona* that the trial testimony of an expert witness who restates an absent laboratory analyst's factual assertions in support of his own opinion testimony violates the Confrontation Clause because the absent lab analyst's factual assertions were offered for the truth of the matter asserted, and were thus testimonial. *Smith*, 602 U.S. at 783, 795.

Relying on *Smith*, Watkins contends that the State impermissibly used Karpf's testimony to relay the factual assertions and conclusions in Sloan's report. The record shows—and the State concedes—that the State offered Sloan's report and Karpf's testimony relating the factual assertions in Sloan's report to prove

26

the truth of the matter asserted, i.e., that Sloan's test results showed the substance was in fact cocaine. Watkins had no opportunity to cross-examine Sloan before or at trial. For these reasons, Karpf's testimony relating the factual assertions in Sloan's report violated the Confrontation Clause under the United States Supreme Court's decision in *Smith*, and therefore the trial court clearly and obviously erred in admitting it. See *Smith*, 602 U.S. at 798 (II).

Third, the trial court's error "affected the outcome of the [trial] court proceedings" as to the drug-related counts. See *Kelly*, 290 Ga. at 33 (citation and punctuation omitted). The record shows—and the State concedes—that Karpf's testimony relating the factual assertions in Sloan's report affected the outcome of the trial as to the counts for possession of cocaine and possession of a firearm during commission of a felony predicated on possession of cocaine because the State could not have proven that the substance seized from the apartment was in fact cocaine without that testimony from Karpf.

However, although Watkins contends that the trial court's error tainted the trial on all counts, we conclude that the trial court's

error did not likely affect the outcome of the trial as to the counts for murder, aggravated assault, feticide, aggravated assault with a deadly weapon, possession of a firearm during commission of a felony predicated on aggravated assault, and possession of a firearm during commission of a felony predicated on feticide. Watkins contends that the trial court's error infected the verdicts on the foregoing counts because it allowed the State to introduce evidence portraying Watkins as a "gun-toting drug dealer." However, there was substantial compelling evidence that Watkins murdered Clark independent of the drug-related evidence. To begin, the GBI firearms analyst's testimony regarding the actions required to fire the .357 Magnum undercut Watkins's contention that the gun accidentally fired when Clark "palm roll[ed]" it to him and thus damaged Watkins's credibility. Additionally, evidence from Clark's diary demonstrating her fear that Watkins would cause her to have a miscarriage provided strong evidence from which the jury could infer that Watkins murdered Clark because she refused to have an abortion. And the diary entries leading up to Clark's death showing

an escalation of Watkins's physical abuse of Clark in the months before the shooting, in conjunction with testimony of the domestic violence expert, provided additional evidence to support the verdicts. Under these circumstances, we cannot say that the trial court's error likely affected the outcome of the trial on the charges of murder, aggravated assault, feticide, aggravated assault with a deadly weapon, possession of a firearm during commission of a felony predicated on aggravated assault, and possession of a firearm during commission of a felony predicated on feticide.

Having satisfied the first three prongs of the plain-error test with respect to the counts for possession of cocaine and possession of a firearm during the commission of a felony predicated on possession of cocaine, we turn to evaluate the final prong of the plain-error analysis respecting those counts. We conclude that the trial court's error "seriously affected" the "fairness, integrity, or public reputation of judicial proceedings" with respect to the possession of cocaine and possession of a firearm during the commission of a felony predicated on possession of cocaine. Cf.

29

*United States v. Bane*, 720 F3d 818, 830-831 (IV) (11th Cir. 2013) (holding that the trial court plainly erred in violation of the United States "Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (120 SCt 2348, 147 LE2d 435) (2000) because it exceeded the statutory maximum without a jury finding regarding the amount of the loss"; "concluding that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings" because "the error in this case affected Bane's constitutional right to a jury trial" under the Sixth Amendment to the United States Constitution).

Having met his burden of showing that the trial court plainly erred in admitting Karpf's testimony with respect to the counts for possession of cocaine and possession of a firearm during commission of a felony predicated on possession of cocaine, Watkins has established that his convictions on those counts cannot stand and

we therefore reverse[10] those convictions.[11]

4. Watkins contends that the trial court plainly erred in permitting evidence and closing argument regarding his pre-arrest "silence or failure to come forward" in violation of OCGA § 24-8-801 ("Rule 801") and that his trial counsel provided constitutionally ineffective assistance by failing to object to the admission of such evidence and argument. For the reasons explained below, these

[10] The State may retry Watkins on the counts of possession of cocaine and possession of a firearm during the commission of a felony predicated on possession of cocaine because the evidence was legally sufficient to sustain those convictions. See, e.g., *Jenkins v. State*, 317 Ga. 585, 585 (894 SE2d 566) (2023) ("[W]e reverse [the appellant's] convictions; because the evidence against him was constitutionally sufficient, he may be retried."); *Cowart v. State*, 294 Ga. 333, 335 n.2 (751 SE2d 399) (2013) ("[I]n evaluating the legal sufficiency of the evidence to support a conviction, we may consider evidence that was erroneously admitted at trial.").

[11] Watkins also raises a claim that trial counsel provided constitutionally ineffective assistance by failing to object to Karpf's testimony. However, because we conclude that the trial court plainly erred in admitting Karpf's testimony, we need not decide whether trial counsel provided constitutionally ineffective assistance in failing to object to Karpf's testimony. Cf. *Debelbot v. State*, 308 Ga. 165, 166 n.2 (839 SE2d 513) (2020) (explaining that the Court need not consider an alleged trial-court error under *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963) and alleged instructional error "[b]ecause we are reversing with respect to one of the claims of ineffective assistance"). We also conclude that Watkins's ineffective assistance of counsel claim with respect to the non-drug convictions fails because "the test for prejudice in the ineffective assistance analysis is equivalent to the test for harm in plain error review." *Knighton v. State*, 310 Ga. 586, 597 (853 SE2d 89) (2020).

claims fail.

(a) As an initial matter, Watkins concedes that he did not preserve for ordinary appellate review an objection to the admission of the evidence and argument at issue. As a result, whether the trial court abused its discretion in admitting that evidence "is subject to review only for plain error." *Baker*, 319 Ga. at 461 (2). See also *Kenney*, 315 Ga. at 413 (2) n.10. However, Watkins "has waived review of . . . the allegedly improper closing argument[s] . . . due to his failure to object below." *Gates v. State*, 298 Ga. 324, 329 (4) (781 SE2d 772) (2016) (explaining that "plain error review for alleged improper remarks during closing argument in criminal cases does not exist pursuant to . . . OCGA § 24-1-103 dealing with rulings on *evidence*[ ]").

OCGA § 24-8-802 ("Rule 802") generally prohibits the admission of hearsay. See OCGA § 24-8-802 ("Hearsay shall not be admissible except as provided by this article; provided, however, that if a party does not properly object to hearsay, the objection shall be deemed waived, and the hearsay evidence shall be legal evidence

and admissible."). "'Hearsay' means a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c). A "statement" means "[a]n oral or written assertion" or the "[n]onverbal conduct of a person, if it is intended by the person as an assertion." OCGA § 24-8-801 (a). Under what is sometimes referred to as the "adoptive-admission" rule, "[a] statement of which the party has manifested an adoption or belief in its truth" is not excluded by the hearsay rule. OCGA § 24-8-801 (d) (2) (B). See also OCGA § 24-8-802.

At trial, the State contended that Watkins fabricated his accident defense because he did not tell anyone before trial that the shooting was an accident. In that vein, Adams—whom Watkins summoned to Clark's apartment on the night of the shooting— testified that Watkins "never told [her] what happened" that night. Caldwell testified that Watkins never told her "what happened" after he was arrested, although she stated that Watkins repeatedly told her that he "didn't shoot nobody." Additionally, Detective

33

Cavin testified that "nobody other than [Watkins and Clark] know what happened[ ]" and no one told her that [the shooting] was an accident when [she was at Clark's apartment] on the evening of" the shooting. The State offered all of this testimony as substantive evidence of Watkins's guilt. On appeal, Watkins contends under a hearsay theory of exclusion that the trial court plainly erred in admitting these instances of his pre-arrest silence on the ground that they do not qualify as adoptive-admissions, see Rule 801 (d) (2) (B), because they are not Watkins's "statement[s]," see Rule 801 (a) (2).[12]

We see no clear or obvious error in the trial court's decision to admit the instances of what Watkins refers to as his pre-arrest

---

[12] Watkins does not contend on appeal that the admission of this evidence violated his rights under the United States or Georgia Constitutions. See *State v. Orr,* 305 Ga. 729, 734 (2) n.4 (827 SE2d 892) (2019) (explaining, where the defendant did not argue that the State's introduction of his pre-arrest silence at trial violated the United States or Georgia Constitutions, that we did not "address any constitutional question regarding such comments"; noting that "the United States Supreme Court has not decided whether evidence of a defendant's silence before custodial interrogation or before being advised of or invoking the right to remain silent is admissible under the federal Constitution as substantive evidence" and "federal circuit courts and state high courts are divided on this issue, and some state high courts have excluded such evidence under their state Constitutions").

"silence or failure to come forward." To begin,

> [a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules, as prescribed pursuant to constitutional or statutory authority, applicable in the court in which the matter is pending. Evidence which is not relevant shall not be admissible.

OCGA § 24-4-402. Important here, the current Evidence Code, which took effect on January 1, 2013, prior to Watkins's trial, abrogated the "bright-line rule" this Court announced in *Mallory v. State*, 261 Ga. 625, 629-630 (5) (409 SE2d 839) (1991) "excluding all 'comment upon a defendant's silence or failure to come forward [as] far more prejudicial than probative[.]'" *State v. Orr*, 305 Ga. 729, 739 (3) (827 SE2d 892) (2019). Under the current Evidence Code, "whether evidence of a criminal defendant's pre-arrest 'silence or failure to come forward' is admissible" "requires careful consideration of what specific sorts of evidence that come within the broad phrase 'silence or failure to come forward' may be properly offered under which particular evidence rules and theories." *Orr*, 305 Ga. at 739 (3) (a).

35

Applying those principles here, Watkins's pre-arrest "silence or failure to come forward" was relevant to his contention that the shooting was an accident and the State's contention that Watkins fabricated his accident defense at trial. See OCGA §§ 24-4-401 and 24-4-402. Moreover, we cannot say that the "probative value" of this evidence was "substantially outweighed by the danger of unfair prejudice[.]" OCGA § 24-4-403. Indeed, as we explained in *Orr*, "[c]ertain aspects of a defendant's failure to come forward to the police might also be offered not as a particular assertive statement subject to the hearsay rules, but rather as circumstantial evidence of guilt." 305 Ga. at 741 (4) (a).

Turning to Watkins's hearsay theory of exclusion, we agree with him that the instances of his "silence or failure to come forward" at issue do not qualify as his "statement[s]" under Rule 801 (a) (2) because there was no evidence that Watkins intended them as assertions. However, to be excludable under the hearsay rule, see Rules 801 (c) and 802, the evidence must be a "statement." Because the instances of silence at issue are not "statement[s]" under Rule

801 (a) (2), Watkins has not shown under his theory of exclusion that the trial court was required to exclude them. See OCGA §§ 24-8-801 (a) (2) and (c); 24-8-802.

Watkins offers no other authority—and we are aware of no federal or Georgia authority—requiring a conclusion that the admission of this evidence "was a clear error that was not open to reasonable dispute." *Hassan v. State*, 318 Ga. 673, 678 (1) (899 SE2d 693) (2024). For all of these reasons, Watkins has not met his heavy burden of showing that the trial court clearly and obviously erred. See, e.g., id. (concluding that the trial court did not plainly err in admitting testimony because the appellant did not meet his burden of showing that it "was a clear error that was not open to reasonable dispute"); *Carter v. State*, 317 Ga. 689, 694 (2) (895 SE2d 295) (2023) (concluding that the trial court did not plainly err in admitting a document showing proof of the appellant's incarceration because any error was not "clear and obvious beyond reasonable dispute"). This plain-error claim therefore fails.

(b) Watkins also contends that trial counsel provided

constitutionally ineffective assistance by failing to object to the admission of these instances of Watkins's "silence or failure to come forward."

To prevail on a claim of ineffective assistance of counsel, a "defendant must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "To satisfy the deficiency prong, a defendant must demonstrate that his attorney 'performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms.'" *Perkins v. State*, 313 Ga. 885, 901 (5) (873 SE2d 185) (2022) (citation omitted). "This is no easy showing, as the law recognizes a 'strong presumption' that counsel performed reasonably, and [a defendant] bears the burden of overcoming this presumption." *Davis v. State*, 299 Ga. 180, 183 (2), (787 SE2d 221) (2016) (quoting *Strickland*, 466 U.S. at 689 (III) (A)). "To carry this burden, [a defendant] 'must show that no reasonable lawyer would have done what his lawyer did, or would have failed

38

to do what his lawyer did not.'" *Gardner v. State*, 310 Ga. 515, 518

(2) (852 SE2d 574) (2020) (citation omitted).

"To satisfy the prejudice prong, a defendant must establish a

reasonable probability that, in the absence of counsel's deficient

performance, the result of the trial would have been different."

*Perkins*, 313 Ga. at 901 (5). "A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Strickland*, 466

U.S. at 694 (III) (B). "This burden is a heavy one[.]" *Young v. State*,

305 Ga. 92, 97 (5) (823 SE2d 774) (2019). Moreover, "[t]he reviewing

court need not 'address both components of the inquiry if the

defendant makes an insufficient showing on one.'" *Davis*, 299 Ga. at

183 (2) (787 SE2d 221) (quoting *Strickland*, 466 U.S. at 697 (IV)).

As we explained in Division 4 (a), Watkins has not cited any

authority—and we are aware of none—demanding the exclusion of

Watkins's "silence or failure to come forward." Therefore, we cannot

say that trial counsel's failure to object was constitutionally

deficient. See *Redding v. State*, 311 Ga. 757, 765-766 (5) (b) (858

SE2d 469) (2021) (concluding no deficient performance where the

appellant cited "no controlling precedent that his trial counsel supposedly missed in not raising '*Mallory*-style' challenges[;]" noting that "*Orr* was decided in 2019, and at the time of [the appellant's] trial [in 2017] the viability of *Mallory* remained unsettled"); *Williams v. State*, 302 Ga. 474, 482 (4) (a) (807 SE2d 350) (2017) ("It does not appear that this Court[] . . . ha[s] addressed the question, and trial counsel's performance cannot be deemed deficient for not raising an unsettled question of law."). This ineffective assistance of counsel claim thus fails.

5. Watkins next contends that the trial court abused its discretion in limiting Detective Cavin's testimony about a hand injury Watkins had when he was arrested. We cannot say that the trial court abused its discretion in this respect.

At a pre-trial hearing, Detective Cavin testified that the injury she observed on Watkins's hand at the time of his arrest appeared to have been a burn from a gun's muzzle blast. At trial, the State called Detective Cavin to testify as a lay witness. She testified that she had been employed by the East Point Police Department for

"almost 11 years;" had been POST certified since 2003; and had investigated "major cases" for 8 years, including "21 [or] 22" homicides. She further testified about the trajectory of the bullets and identified the firearms, bullets, and firearm magazines found at the scene. She also explained that she oversaw the collection of gunshot residue on Watkins on the night of the shooting.

Watkins's trial counsel attempted to cross-examine Detective Cavin about the hand injury Watkins had on the night of the shooting. After he showed Detective Cavin a photograph of Watkins's injured left hand and asked her what the injury was, the State objected to the question as calling for speculation. The trial court sustained that objection. Watkins's trial counsel then attempted to lay foundation that identifying a skin burn from a muzzle blast was within the scope of Detective Cavin's professional knowledge, asking: "[I]n situations where guns were fired, have you ever encountered a situation where someone was possibly burned by a gunshot?" Detective Cavin responded that she had encountered such injuries, but that she could not "make th[e] decision" of whether

41

such an injury resulted from a muzzle blast because she would "have to go [into] medical terms," and she was "a police officer, not a physician."

Watkins's trial counsel then attempted to cross-examine Detective Cavin about the mechanics of a muzzle blast. After Detective Cavin explained what a muzzle blast was, the State once again objected that Detective Cavin had "not been qualified as an expert[,]" and the trial court sustained that objection. Watkins's trial counsel continued cross-examining Detective Cavin, and the State renewed its objection that Detective Cavin had not been qualified as an expert. The trial court excused the jury and requested that Watkins's trial counsel attempt to "lay [a] proffer . . . outside the presence of the jury[.]" Watkins's trial counsel then stated, "I just want to clarify for the Court what I'm going to do, I'm just probably going to ask Detective Cavin what his injuries were[.]" Detective Cavin responded, "He has marks in his hand coming from I'm suspecting the gun." Watkins's trial counsel then asked, "And were you able to determine from your training and experience as a

homicide detective what you suspected that burn mark to be?" Detective Cavin responded, "No." The trial court then instructed Watkins's trial counsel that she could ask Detective Cavin about prior inconsistent statements she made with respect to the injury but could not ask her to give an opinion about the cause of the injury. Later in the trial, a testifying medical examiner stated, after examining a photograph of Watkins's hand injury, that "[i]t could be a cut or . . . a laceration," but that it was "probably not" a burn. On appeal, Watkins contends that the trial court abused its discretion in limiting Detective Cavin's testimony concerning Watkins's hand injury, arguing that lay witnesses may draw from their professional experiences to guide their opinions without necessarily being treated as expert witnesses.

Pretermitting whether the trial court abused its discretion in limiting Detective Cavin's testimony about Watkins's hand injury, it is highly probable that any such error did not contribute to the verdicts on the non-drug counts because the State provided strong evidence of Watkins's guilt. See *Jivens v. State*, 317 Ga. 859, 863 (2)

43

(896 SE2d 516) (2023) ("A trial court's evidentiary error warrants reversal only if it was harmful. The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.") (citation and punctuation omitted); *Johnson v. State*, 316 Ga. 672, 684 (4) (c) (889 SE2d 914) (2023) ("The burden to make this showing is the State's to bear, and in determining whether the showing has been made, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have weighed it."). Here, Watkins sought to use the testimony he claims the trial court abused its discretion in limiting to support his accident defense. However, as noted above, the State provided evidence from the GBI firearms analyst that undermined Watkins's accident defense and strengthened the State's argument that Watkins intentionally fired the gun at Clark. Additionally, the State's argument that Watkins intentionally shot Clark was supported by compelling evidence from Clark's diary entries and the domestic abuse expert, as discussed above. For all of these reasons, it is highly probable that any error in limiting

44

Watkins's trial counsel's cross-examination did not contribute to the verdicts on the counts related to the murder of Clark. See, e.g., *Bacon v. State*, 316 Ga. 234, 238-239 (2) (887 SE2d 263) (2023) (pretermitting whether the trial court abused its discretion by excluding a gun shop owner as an expert witness, any error was harmless because "the evidence establishing [the defendant's] guilt was strong").

6. Watkins next contends that trial counsel provided constitutionally ineffective assistance by failing to object to the authentication of a document belonging to Watkins's step-brother that allegedly instructed him how to testify. As we explain below, Watkins forfeited this claim by failing to timely raise it.

To prevail on a claim of ineffective assistance of counsel, it "must be raised and pursued at the earliest practicable moment, which for a claim of ineffective assistance of trial counsel is at the motion for new trial stage if the defendant is no longer represented by the attorney who represented him at trial." *Patterson v. State*, 314 Ga. 167, 171 (2) (a) (875 SE2d 771) (2022). Here, Watkins did

not raise this claim of ineffective assistance in his first, second, or third amended motions for new trial, although he was no longer represented by trial counsel when he filed those amended motions. Although appellate counsel questioned trial counsel about the document at issue during the second motion-for-new-trial hearing, "'questioning during the motion-for-new-trial hearing, by itself, is insufficient to amend a motion for new trial to add a claim where the trial court did not rule on the claim.'" *Allen v. State*, 317 Ga. 1, 12-13 (4) (e) (890 SE2d 700) (2023) (citation and punctuation omitted). Here, the trial court did not address this alleged claim in its order denying Watkins's motion for new trial. Consequently, Watkins forfeited any such claim. See id. (explaining that the appellant forfeited his ineffective assistance of counsel claim where he "did not raise [the] claim . . . in his initial motion for new trial or the amendments made thereto by appellate counsel. He did not raise such a claim in the hearing on the motion").

7. Lastly, Watkins contends that the cumulative effect of multiple errors in the trial court prejudiced him. We have concluded

one trial-court error in admitting Karpf's testimony in violation of the Sixth Amendment to the United States Constitution and pretermitted three trial-court errors in admitting certain statements from Clark's diary entries containing evidence violating Rules 403 and 404 and limiting Detective Cavin's testimony on Watkins's hand injury.

Under *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020), we "consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel." *Talley v. State*, 314 Ga. 153, 165-166 (4) (875 SE2d 789) (2022) (citation and punctuation omitted). "To establish cumulative error, [the appellant] must show that (1) at least two errors were committed in the course of the trial; and (2) considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [the appellant] a fundamentally fair trial." *Jackson v. State*, 317 Ga. 95, 106-107 (4) (891 SE2d 866) (2023).

We conclude that Watkins has not shown cumulative error

entitling him to a new trial. To the extent that Watkins was prejudiced by the trial court's limitation of Detective Cavin's testimony, that evidence prejudiced Watkins on the counts related to Clark's murder because it served to undermine Watkins's accident defense. As explained above, Karpf's testimony about cocaine was prejudicial to the trial on the drug charges and only minimally prejudicial as to the other charges. Additionally, Clark's diary entries that Watkins's was "in jail" likely prejudiced Watkins on the drug charges alone. But as we explain in Division (2) (b) and (c), those statements likely did not prejudice Watkins on the murder counts. The cumulative prejudicial effect of evidence relating to the drug convictions is resolved by the reversal of those convictions. And we cannot say that the remaining prejudice from the trial court's limitation of Detective Cavin's cross-examination resulted in cumulative prejudice to Watkins on the counts related to Clark's murder. This claim therefore fails.

*Judgment affirmed in part and reversed in part. All the Justices concur, except LaGrua, J., disqualified.*